IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| Matthew Reimann (N-81060), | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | Case No. 16 C 50175 |
| v. | ) | |
| | ) | Judge Philip G. Reinhard |
| Brion Hanley, et al., | ) | |
| Defendants. | ) | |

## ORDER

Plaintiff's renewed application for leave to proceed *in forma pauperis* [7] is granted. The court orders the trust fund officer at plaintiff's place of incarceration to deduct $7.60 from plaintiff's account for payment to the Clerk of Court as an initial partial payment of the filing fee, and to continue making monthly deductions in accordance with this order. The Clerk of Court shall send a copy of this order to the trust fund officer at the Stateville Correctional Center. Plaintiff's motion to proceed as a John Doe [5] is denied. Plaintiff may proceed with claims against Defendants Hanley, Hoffman, Gomez, Hardy, and Lohiser as outlined in this order. All other claims and defendants are dismissed for the reasons stated in this order. The court further directs the Clerk of Court to: (1) file plaintiff's complaint [1]; (2) correct the spelling of plaintiff's last name on the docket to "Reimann"; (3) issue summonses for service on defendants Hanley, Hoffman, Gomez, Hardy, and Lohiser by the U.S. Marshal; and (4) send plaintiff five blank USM-285 service forms, a magistrate judge consent form, filing instructions, and a copy of this order. The court advises plaintiff that a completed USM-285 (service) form is required for each named defendant. The U.S. Marshal will not attempt service on a defendant unless and until the required forms are received. The U.S. Marshal is appointed to serve the defendants. Plaintiff's motion for attorney representation [4] is denied without prejudice to renewal later in this case.

## STATEMENT

Plaintiff Matthew Reimann, a prisoner confined at the Stateville Correctional Center, brings this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that prosecutors breached the terms of a cooperation agreement and caused his identity as an informant to be revealed, subjecting him to a risk of harm by other inmates.

Currently before the court are plaintiff's application to proceed *in forma pauperis*, his complaint for initial review under 28 U.S.C. § 1915A, his motion for leave to proceed as a John Doe, and his motion for attorney representation.

Plaintiff's application for leave to proceed *in forma pauperis* demonstrates he cannot prepay the filing fee and is thus granted. Pursuant to 28 U.S.C. § 1915(b)(1), (2), the court

orders: (1) plaintiff to immediately pay (and the facility having custody of him to automatically remit) $7.60 to the Clerk of Court for payment of the initial partial filing fee and (2) plaintiff to pay (and the facility having custody of him to automatically remit) to the Clerk of Court twenty percent of the money he receives for each calendar month during which he receives $10.00 or more, until the $350 filing fee is paid in full. The court directs the Clerk of Court to ensure that a copy of this order is mailed to each facility where plaintiff is housed until the filing fee has been paid in full. All payments shall be sent to the Clerk of Court, United States District Court, 219 South Dearborn Street, Chicago, Illinois 60604, attn: Cashier's Desk, 20th Floor, and shall clearly identify plaintiff's name and the case number assigned to this case.

### Factual Allegations

Plaintiff's factual allegations seem far-fetched and exaggerated. Nonetheless, at the pleading stage, these allegations must be accepted as true unless the complaint "is frivolous, malicious, or fails to state a claim upon which relief may be granted." See 28 U.S.C. § 1915A(b)(1).

Plaintiff's allegations are as follows. Plaintiff alleges that from August 30, 2012, through September 5, 2012, he was housed in the DeKalb County Jail because of a pending post-conviction petition. At that time, he came into contact with Jack McCullough, who was awaiting trial for murder.

Plaintiff alleges that on September 7, 2012, he was visited by Illinois State Police Special Agent Brian Hanley and Sycamore Police Detective Daniel Hoffman to discuss his interactions with McCullough. Plaintiff alleges that he initially told investigators he could not help them because he was fearful of his safety should gang members in the Illinois Department of Corrections ("IDOC") learn that he had assisted police.

Plaintiff alleges that after hearing his account of his conversations with McCullough, the officers, in conjunction with then-DeKalb County Assistant State's Attorneys Julie Trevarthen and Victor Escarcida, reached an agreement with him to allow him to testify anonymously at McCullough's trial, along with other concessions, in exchange for his testimony.

The agreement, according to plaintiff, included: (1) DeKalb County prosecutors would seek a "gag order" to prevent his identity from being disclosed to the public without order of court; (2) prosecutors would waive a timeliness defense to his pending post-conviction petition; and (3) authorities would discuss with prison administrators the reduction of plaintiff's security classification and his transfer to Dixon Correctional Center to be closer to an elderly family member.

Plaintiff contends that pursuant to that agreement, prosecutors requested that he be allowed to testify anonymously in the McCullough trial, which was granted. Prosecutors also requested a "gag order" to prevent disclosure of his identity, which also was granted.

On September 12, 2012, plaintiff testified as a John Doe in the McCullough case, which was presided over by Judge Hallock. However, by his own admission, plaintiff denied that any promises were made in exchange for his testimony. Plaintiff contends that Hanley had admonished him to avoid "magic words" that could undermine his testimony. He further contends that Hanley promised him that he had nothing to worry about, and that his identity would be protected.

Plaintiff also states that he asked to meet with his attorney in his post-conviction proceeding, Peter Gruber, prior to his testimony, but he was only able to speak with him briefly before being called to the stand to testify. Later that night, according to plaintiff, Gruber visited plaintiff in jail, where plaintiff told him about the promises made by the state and Hanley's admonition to him that he should deny that any promises were made.

The crux of plaintiff's complaint is that prosecutors failed to follow through on this oral agreement for him to provide testimony in the McCullough trial, and that someone involved in the prosecution violated the gag order, subjecting him to a risk of harm in prison.

Following his testimony, plaintiff was returned to the custody of the Illinois Department of Corrections. On September 21, 2012, plaintiff received a letter and card from McCullough's sisters (who believed McCullough to be guilty and supported his prosecution) thanking him for his testimony. Plaintiff alleges that Trevarthen disclosed his identity to the women in violation of the gag order. His only support for this allegation is a Facebook posting by one of the sisters. In that posting, the sister indicates that she communicated with Trevarthen about an informant in the case who was seeking a sentence reduction, but this posting appears to be in reference to a different informant who testified publicly, and not plaintiff. *See* [1] at 54-55.

Plaintiff contends that employees in the Stateville mailroom and an unnamed "security specialist" read the letter and card, and shared the contents with others. He further alleges that "whether deliberately or not" the letter and card were delivered to the wrong cell and read by two "unknown inmates," who returned the correspondence to the gallery officer. [1] at ¶ 23. The gallery officer then placed in on a desk in the front of plaintiff's cell while plaintiff was in the shower area. On at least two occasions, plaintiff was told by correctional officers that he had "done the right thing." *Id.*

Plaintiff alleges that he contacted Gruber to follow up with him about the promises the state had made and to notify him that someone had violated the gag order. According to plaintiff, at a November 6, 2012, status hearing, he "implored" Gruber to file something with the court concerning the violation of the gag order and the state's failure to follow through on its promises, but he did not do so.

According to plaintiff, he met with Hanley at the prison on two occasions in November and December 2012, and Hanley told him that prison officials had agreed to reduce his security classification and get him transferred to Dixon Correctional Center when space became

available.  Hanley also told him that he would speak with the State's Attorney's Office, but there had been a shake-up due to elections.   [1] at ¶ 28.

Plaintiff also told Hanley that someone must have violated the gag order, placing his life at risk, and Hanley said he would look into it.   Plaintiff's security classification ultimately was reduced, but according to plaintiff nothing was done regarding his complaint that the gag order had been violated.

By December 2012, according to plaintiff, gang members were confronting him due to rumors that he had cooperated with police.   Around this time, Assistant Deputy Director Gomez and Warden Hardy stopped plaintiff as he was in the lunch line and told him he would be receiving a new identification card reflecting his reduced classification due to cooperation with police and the DeKalb County State's Attorney.   Within a short time thereafter, plaintiff's security classification was reduced.

On February 20, 2013, plaintiff prepared a "Motion in Complaint for Investigation and Sanctions," which he mailed to Gruber to file with the DeKalb County Circuit Clerk's Office.   *See* [1-2] at 13-14.   In that motion, plaintiff states his belief that prosecutors, police, or the court violated the "gag order" and disclosed his identity.   *Id.*   Plaintiff also alleges that McCullough, who was then imprisoned in Menard Correctional Center, was "said to be" showing a court document with his name on it to other inmates.   *Id.*   Plaintiff mailed another copy of this document to the DeKalb County Circuit Clerk's Office on April 1, 2013, and Judge Stuckert, who was presiding over his post-conviction proceedings.   According to plaintiff, the motion was not filed at that time.

On June or July 17, 2013 (the exact date is unclear from plaintiff's complaint), certain gang members began to circulate rumors being spread by a correctional officer, Lt. Lohiser, that plaintiff had testified against a former police officer.   Shortly thereafter, plaintiff was attacked by several inmates in the shower and suffered severe cuts and bruises.   Plaintiff was interviewed by Internal Affairs, which moved him to another location, Delta House, in the prison.   But he was immediately accused of being a snitch and threatened with violence.   He was later "sucker punched" in the back of the head.   Internal Affairs heard rumors of another potential attack, so plaintiff was moved to Bravo House at the end of 2013.

On July 21, 2013, plaintiff wrote Judge Stuckert and requested that Gruber be removed as his attorney in the post-conviction case because, according to Plaintiff, Gruber was failing to act on matters concerning his safety.   A new attorney, Daniel Transier, was appointed, but plaintiff alleges that he too failed to raise the issue of the state's oral agreement to waive a timeliness defense in his post-conviction proceedings.   The state filed a motion to dismiss on timeliness grounds on June 10, 2013.

According to plaintiff, he first learned of the motion to dismiss during an August 15, 2013, meeting with Transier.   At that time, Transier told him he could not file anything new in the case other than to respond to the state's specific allegations.

On October 23, 2013, plaintiff met with Detective Hoffman, and told him that he had not been transferred to Dixon Correctional Center, and that the state had not honored its promises in regard to his post-conviction petition. He also told Detective Hoffman that he was in danger due to threats that had been made against him as a result of the violation of the gag order. Detective Hoffman said he would investigate the matter and talk to Agent Hanley about getting plaintiff transferred to Dixon Correctional Center for his safety, but plaintiff never heard from him again.

On March 5, 2014, during a status hearing in the post-conviction proceedings, Transier told the court that plaintiff wanted Gruber to testify as to certain matters involving another case that might affect the post-conviction proceeding. Assistant State's Attorney Duke Harris told the court that plaintiff was "wanting consideration for what he may or may not have done in connection with another matter," but it was not relevant to the post-conviction proceeding. *See* [1-1] at 51. At that time, Judge Stuckert told Transier to file a motion if he believed the state had violated an agreement related to his testimony. No such motion was filed.

Subsequently, on April 16, 2014, the DeKalb County Circuit Clerk file-stamped several motions, including: (1) plaintiff's "Motion in Complaint for Investigation and Sanctions," (2) a motion to seal and impound the record which related to Harris' comments at the March 5, 2014, hearing, and in which plaintiff also asked for a hearing on "promises made," as it related to the post-conviction proceedings; and (3) a motion to supplement his response to the post-conviction petition, which states without elaboration that the state waived the defense of timeliness. Plaintiff alleges these motions were received before the clerk file stamped them, although with the exception of the "Motion in Complaint for Investigation and Sanctions," it is not entirely clear when plaintiff contends that he sent the clerk these motions. Ultimately, on June 26, 2014, the state court granted the motion to dismiss plaintiff's post-conviction petition. Judge Stuckert subsequently denied plaintiff's motion to reconsider the granting of the motion to dismiss.

On July 11, 2014, plaintiff filed a *pro se* motion for a sealed hearing regarding the alleged violation of the gag order in the McCullough case. Plaintiff mailed a copy of the motion to Judge Hallock, who responded with a letter indicating that McCullough's criminal case was an inappropriate venue in which to raise the issue and suggesting that plaintiff retain private counsel to obtain legal advice about his concerns. *See* [1-2] at 31-37. The motion ultimately was ruled on by Judge McAdams, who entered an order stating that because the criminal case was on appeal, the Court lacked authority to rule on the motion. *See* [1-2] at 82.

## Analysis

### Plaintiff's Motion to Proceed Under a Fictitious Name

As an initial matter, plaintiff seeks to proceed with this case as a "John Doe." This motion is denied. The use of fictitious names in litigation is disfavored, and the judge has an

independent duty to determine whether exceptional circumstances justify a departure from this rule. *Doe v. Blue Cross & Blue Shield United of Wisconsin*, 112 F.3d 869, 872 (7th Cir. 1997). The court begins with "the principle that judicial proceedings, civil as well as criminal, are to be conducted in public." *Id.* "Identifying the parties to the proceeding is an important dimension of publicness. The people have a right to know who is using their courts." *Id.*

To proceed anonymously, a party must demonstrate "exceptional circumstances" that outweigh the public policy in favor of open proceedings and any prejudice to the opposing party that would result from anonymity. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016).

The use of pseudonyms may be appropriate where a government informant faces a risk of serious bodily harm as a result of cooperation with the government. *United States v. Doe*, 655 F.2d 920, 922 n. 1 (9th Cir. 1980); *see M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir. 1998) (a plaintiff should be allowed to proceed anonymously only in exceptional cases, including those involving "real danger or physical harm"). Although plaintiff contends that he remains at risk of attack by other inmates, *see* [1] at ¶ 57, the attacks and confrontations he references in his complaint last occurred in 2014. Further, plaintiff specifically pleads in his complaint that the prison's Internal Affairs department investigated the threats against him and moved him to a different division on two occasions. Plaintiff has not established that this is an extraordinary case that requires the use of a pseudonym.

As a practical matter, the court observes that an inmate in state custody would have difficultly accessing the documents filed in this case given that it is unlikely that inmates have either PACER accounts or the funds to upload documents by means of PACER. *See Perry v. Goord*, No. 06 CV 828, 2009 WL 1812822, at *3 (W.D.N.Y. June 25, 2009). While an inmate could have someone outside the facility access court documents through PACER or a courthouse terminal, the court thinks that unlikely. *Id.* Further, all contact between the court and plaintiff in this case will have to go through prison channels, so to the extent plaintiff contends there are "leaks" in the prison mail system, using a pseudonym will not alleviate those concerns.

Finally, the court observes that cases in which plaintiffs allege that they have been placed at risk of harm due to being branded a "snitch" are routinely litigated by inmates under their own name. *See*, *e.g.*, *Dale v. Poston*, 548 F.3d 563 (7th Cir. 2008); *Smith v. Buss*, 364 F. App'x 253 (7th Cir. 2010); *Saunders v. Tourville*, 97 F. App'x 648 (7th Cir. 2004). Plaintiff presents no special circumstances that would justify a departure from the general rule that parties litigate under their own names.

**<u>Plaintiff's Claims</u>**

Plaintiff's complaint names Hanley, Hoffman, Trevarthen, Escarcida, Harris, DeKalb County Judges Stuckert, Hallock, and McAdams, Transier, Gomez, Hardy, and Lt. Lohiser. Plaintiff brings several claims: (1) cruel and unusual punishment in violation of his Eighth Amendment rights (Count I); (2) violation of his right to access the courts based on his contention that authorities thwarted his efforts to put forth testimony regarding the oral agreement prosecutors allegedly made to waive a timeliness defense in his post-conviction proceeding (Count II); (3)

conspiracy to violate his rights (Count III); (4) failure to intervene to prevent the violation of his rights (Count IV); (5) state-law civil conspiracy (Count V); (6) state law intentional infliction of emotional distress (Count VI); and (7) state law legal malpractice (Count VII).

## I. Count I – Fourteenth and Eighth Amendment Violation

Plaintiff couches this claim as an Eighth Amendment claim for cruel and unusual punishment. However, the police and prosecutors named in plaintiff's complaint were not his jailers. Therefore, as to his allegation that police and prosecutors failed to protect him, this claim seems to be more in the nature of a due process, state-created danger claim. *See Coyne v. Cronin*, 386 F.3d 280, 286-87 (1st Cir. 2004) (holding that a claim by inmate informant against federal agent who mistakenly revealed his identity was properly characterized as a due process, rather than Eighth Amendment, claim.)

Authorities' failure to protect someone from third-party violence is typically not a constitutional tort. *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189 (1989). Two exceptions exist to *DeShaney*: (1) if the state has a special relationship with a person, such as if the state has custody of the person, cutting off alternate avenues of aid; or (2) if the "state affirmatively places an individual in a position of danger the individual would not have otherwise faced." *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir. 1993). Here, plaintiff alleges that although they were not his jailers, police and prosecutors knew plaintiff was incarcerated and knew that he feared reprisals from fellow inmates if he testified at the McCullough trial. Yet, he alleges, they failed to protect his confidentiality as promised and failed to take steps to protect him when his fellow prisoners learned he had acted as an informant. Such conduct arguably states a claim under the second *DeShaney* exception. *See Coyne*, 386 F.3d at 287 (due process claim may lie where prisoner alleged that federal agent promised him protection, but took actions that revealed his identity and then failed to protect him).

To state a substantive due process claim under this theory, a plaintiff must sufficiently plead that: (1) defendants created or increased a danger that the plaintiff faced; (2) defendants' failure to protect him from that danger was a proximate cause of the harm he suffered; and (3) defendants' failure to protect him shocks the conscience. *King ex rel. King v. E. St. Louis School Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007). The Seventh Circuit has described the circumstances in which this theory of liability may apply as "rare and often egregious." *Estate of Allen v. City of Rockford*, 349 F.3d 1015, 1022 (7th Cir. 2003).

Although plaintiff contends that members of the prosecution team violated the gag order, and thus revealed his identity, his sole basis for this allegation seems to be that Trevarthen was in contact with McCullough's sisters about the case on Facebook and via email. *See* [1] at ¶ 22. However, in and of itself, this is innocuous behavior, particularly as the discussion he references appears to concern an informant who testified publicly.

Moreover, plaintiff's own complaint and the supporting document indicate alternative avenues for the release of his identity. One of plaintiff's *pro se* motions in his post-conviction proceedings indicated that McCullough also was aware of his identity and spread that information to prison inmates. *See* [1-2] 13-14. Plaintiff also acknowledges in his complaint that he testified at trial about his criminal history, which may have enabled those who attended the trial to piece together his identity. *See* [1] at ¶¶ 18-19. Plaintiff has not plausibly alleged facts indicating either that Trevarthen (or anyone else involved in the prosecution) intentionally revealed his identity or knew that there was a substantial risk that plaintiff's identity would be revealed and disregarded that risk.

However, plaintiff further alleges that he advised Agent Hanley and Detective Hoffman in October of 2013 that he was in danger because his identity had gotten out, but they failed to take any action despite their promises that he would be protected and he would be transferred to another prison. At this early stage, this is sufficient to state a claim against Agent Hanley and Detective Hoffman. *See Coyne*, 386 F.3d at 287-89 (viable due process claim could arise from a failure to protect imprisoned informant after FBI agent found out that his identity had been revealed to fellow prisoners).

The court observes that the timeliness of such a claim may be questionable. In a Section 1983 claim, the court applies the forum state's statute of limitations for personal injury claims, which is Illinois is two years. *See Ray v. Maher*, 662 F.3d 770, 772 (7th Cir. 2011) (citing 735 ILCS 5/13-202). While state tolling rules are used, the accrual of claims is governed by federal law. *Savory v. Lyons*, 469 F.3d 667, 772 (7th Cir. 2006). A cause of action under § 1983 accrues when the plaintiff knows or should know that his rights have been violated. *Id.*

By his own pleading, plaintiff knew by no later than September 21, 2012, when he received the card and letter from McCullough's sisters, that his identity had somehow gotten out. [1] at ¶ 21. His meetings with Agent Hanley and Hoffman occurred between November 2012 and October 2013, and the last physical attack he attributes to having been labeled a snitch occurred prior to the end of 2013. *See* [1] at ¶¶ 27-28, 40, 44. Plaintiff did not file this lawsuit until, at the earliest, May 27, 2016, the date he signed his certificate of service. [1-2] at 84. *See Taylor v. Brown*, 787 F.3d 851, 858 (7th Cir. 2015) (under prison mailbox rule, prisoner pleadings are deemed "filed" when placed in the prison mail system). However, plaintiff alleges that between December 2013 and August 2014, he faced numerous "confrontations" that were a threat this safety. He also contends, albeit in a somewhat conclusory fashion, that he remains at risk of harm due to rumors of him having testified as a "John Doe." Dismissal on the basis of an affirmative defense, like the statute of limitations, is appropriate only if the defense is plain from the face of the complaint. *See Walker v. Thompson*, 288 F.3d 1005, 1009-10 (7th Cir. 2002). At this stage of the case, the court will allow the claim against Agent Hanley and Detective Hoffman to proceed.

Plaintiff further alleges that prison officials placed him at risk of harm by either branding him a snitch or allowing word of his participation in the McCullough trial to get out. Because the state has taken away a prisoner's means to protect himself, the Constitution imposes on officials a duty to protect those in their custody from harm from other prisoners. *Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001). A prison official violates this duty when the official knows of and

disregards an excessive risk to inmate safety. *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). Deliberate indifference requires something more than mere or even gross negligence. *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007). Rather, the officer must have acted with the equivalent of criminal recklessness. *Id.* "Branding an inmate a snitch can expose him to serious harm and may violate the Eighth Amendment." *Merritte v. Kessel*, 561 F. App'x 546, 548 (7th Cir. 2014) (citing *Dale*, 548 F.3d at 570).

Plaintiff alleges that unidentified mailroom employees and an unidentified security specialist read the letter and card from McCullough's sisters, "who in turn shared it with others." [1] at ¶ 23. He further alleges that "whether deliberately or not," the mail from McCullough's sisters was delivered to the wrong cell and read by two unknown inmates before it was delivered to his cell. *Id.* At that point, he alleges, it was placed on the desk in the front part of the cell while plaintiff was in the shower area. *Id.* Plaintiff also alleges that on at least two occasions, unidentified correctional officers told him he "did the right thing." *Id.*

According to plaintiff, Assistant Deputy Director Gomez and Warden Marcus Hardy stopped plaintiff and mentioned his cooperation while he was in a lunch line (presumably in the presence of other inmates) at the end of 2012 or beginning of 2013, stating that he would be getting a new identification card reflecting his reduced classification. [1] at ¶ 33. He also alleges that Lt. Lohiser, an officer at the jail, spread rumors that he had testified against a former police officer, putting him at risk of harm. Shortly thereafter, plaintiff was attacked in the shower. [1] at ¶ 40.

While the negligent handling of the correspondence from McCullough's sisters would not amount to deliberate indifference to plaintiff's safety, plaintiff has plausibly alleged that Gomez, Hardy and Lohiser put him at risk of harm by labelling him as a "snitch" to other inmates. As discussed above, while these claims may have accrued more than two years ago (an issue the court does not address at this time), the statute of limitations for § 1983 claims by prisoners is tolled while the prisoner exhausts his administrative remedies. *See Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir. 2013). Whether the statute of limitations bars plaintiff's claims against Lt. Lohiser, Gomez, and Hardy cannot be resolved by looking at the complaint alone, so plaintiff may proceed with an Eighth Amendment claim against Gomez, Hardy, and Lt. Lohiser at this stage of the case.

## II. Count II – Access to the Courts

Plaintiff alleges that Assistant State's Attorney Harris, Attorney Transier, and Judges Stuckert, Hallock, and McAdams conspired to deprive him of access to the courts by preventing him from putting forth evidence regarding the oral agreement prosecutors allegedly made to waive a timeliness defense in his post-conviction proceeding.

As a preliminary point, plaintiff's claims against Judges Stuckert, Hallock, and McAdams are barred by the doctrine of judicial immunity. Judges are absolutely immune from suit for acts performed in their judicial capacities. *See Dawson v. Newman*, 419 F.3d 656, 660 (7th Cir. 2005); *Lowe v. Letsinger*, 772 F.2d 308, 311 (7th Cir. 1985) ("the doctrine applies even when the

judge is accused of acting maliciously and corruptly"). If a judge errs, a party's remedy is through the appellate process. *Dawson*, 419 F.3d at 661. The actions of which plaintiff complains here – denying or delaying rulings on his motions – were undertaken in defendants' judicial capacities, and thus the judges are entitled to immunity.

Further, plaintiff's claim of a conspiracy consists solely of a bare recitation of the elements of conspiracy, which is insufficient to state a claim under Rule 8. *See Iqbal*, 556 U.S. at 678 (explaining that threadbare recitations of the elements of a cause of action, supported by mere conclusory statements are insufficient to satisfy Rule 8); *see also Redd v. Nolan*, 663 F.3d 287, 292 (7th Cir. 2011) (concluding that mere assertion of a conspiracy is an unsupported legal conclusion and insufficient to state a claim where complaint "includes not a whiff of a conspiratorial agreement or any improper complicity between" defendants).

Conspiracy aside, plaintiff frames his claim as one of denial of access to the courts. The right of access to the courts ordinarily entails that an individual have a fair opportunity to present his claim. *Bell v. Milwaukee*, 746 F.2d 1205, 1261 (7th Cir. 1984), *overruled on other grounds by Russ v. Watts*, 414 F.3d 783, 790 (7th Cir. 2005). In *Bell*, Daniel Bell was shot and killed by a police officer, and another officer conspired with him to cover up the crime. *Bell*, 746 F.2d at 1215-16. Years later, when the truth was uncovered, Bell's relatives sued, alleging that the cover-up deprived them of their due process right of access to the courts, because, by concealing the truth about the killing, the officers prevented the Bell family from realizing they had a cause of action and pursuing a claim. *Id.* at 1261. The Seventh Circuit found that the plaintiffs stated a cause of action because access to the courts must "adequate, effective, and meaningful." *Id.* (internal citation omitted). To deny access to the courts, a defendant need not "literally bar the courthouse door." *Id.* Rather, the right of access to the courts is lost when officials conceal key facts that would form the basis of a claim for redress. *Id.*

Here, plaintiff does not allege that any officials concealed facts from him that prevented him from bringing a cause of action sooner. He was present when the alleged oral agreement for his testimony was made. As noted above, he was aware by August 15, 2013, that prosecutors had filed a motion to dismiss his post-conviction case on timeliness grounds, and so he would have been aware by no later than that date that prosecutors did not intent to honor their alleged oral agreement with him. While plaintiff contends that certain of his *pro se* pleadings were not addressed, or were not properly addressed, by Judge Stuckert in the post-conviction proceeding, this does not amount to a denial of access to the courts. Rather, the appropriate remedy is to appeal those rulings. Therefore, plaintiff has not stated a claim for denial of access to the courts, and this claim is dismissed.

Further, to the extent plaintiff alleges he was denied due process because prosecutors failed to honor the alleged oral cooperation agreement, it is well-established that government promises that induce someone to relinquish a constitutional or other substantial right must be honored. *See Ramallo v. Reno*, 931 F. Supp. 884, 892-93 (D.D.C. 1996) (citing *Santobello v. New York*, 404 U.S. 257, 262 (1971)). Arguably, this principle applies to cooperation agreements with witnesses, particularly where the witness compromises his safety by cooperating with the government. *See Ramallo*, 931 F. Supp. at 893. However, by his own pleading, plaintiff knew

[10]

that the state did not plan to honor its alleged agreement not to challenge his post-conviction petition on timeliness grounds by no later than August 15, 2013, when Transier told him that state had filed a motion to dismiss on that basis. As noted above, plaintiff did not file this suit until May 27, 2016. It is plain from the face of the complaint that any claim against prosecutors for failure to honor terms of the cooperation agreement is time-barred. *See Ray*, 662 F.3d at 772.

### III. Conspiracy

In Count III, plaintiff brings a "conspiracy" claim against defendants based on the same facts underlying his denial of access to the courts claim in Count II. However, as noted above, these allegations are mere legal conclusions. Further, plaintiff has not stated a claim for denial of access to the courts. The absence of any underlying violation of plaintiff's rights precludes any possibility of succeeding on a conspiracy claim. *Indianapolis Minority Contractors Ass'n v. Wiley*, 187 F.3d 743, 754 (7th Cir. 1999). Therefore, plaintiff's conspiracy claim is dismissed.

### IV. Failure to Intervene

Plaintiff alleges in a conclusory fashion that "one or more of the Defendants stood by without intervening to prevent the alleged Constitutional Violations, despite having an opportunity to do so." [1] at ¶ 73. Officials who have a realistic opportunity to step forward and a prevent a fellow official from violating a plaintiff's rights, but fail to do so, may be held liable. *See Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000). However, plaintiff does not elaborate as to what officials failed to intervene to protect his rights or how they failed to do so. Again, this conclusory pleading is insufficient to satisfy Rule 8. Therefore, plaintiff's claim of failure to intervene is dismissed.

### V. Plaintiff's State Law Claims

Plaintiff seeks to recover for (1) state-law civil conspiracy; (2) state law intentional infliction of emotional distress; and (3) state law legal malpractice against Transier. Plaintiff's state-law conspiracy claim contends that police and prosecutors conspired to obtain his testimony against McCullough, then breached the agreement and prevented plaintiff from obtaining redress in court. Plaintiff's intentional infliction of emotional distress claim alleges that defendants' actions were extreme and outrageous, and caused him severe emotional distress. Finally, he alleges that Transier's handling of his post-conviction petition amounted to legal malpractice.

When a district court has original jurisdiction over a § 1983 claim, it also has supplemental jurisdiction over related state law claims pursuant to pursuant to 28 U.S.C. § 1367(a), so long as the state claims "derive from a common nucleus of operative fact" with the original federal claims. *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 936 (7th Cir. 2008). "A loose factual

[11]

connection is generally sufficient." *Houskins v. Sheahan*, 549 F.3d 480, 495 (7th Cir. 2008) (citing *Baer v. First Options of Chicago, Inc.*, 72 F.3d 1294, 1299 (7th Cir. 1995)).

In regard to the intentional infliction of emotional distress claim, the court notes that such a claim has three elements: (1) the conduct must be truly extreme and outrageous; (2) the actor must either intend that his conduct inflict severe emotional distress or at least know that there is a high probability that his conduct will cause such severe emotional distress; and (3) the conduct must in fact cause severe emotional distress. *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988). To meet the standard for IIED, the defendant's conduct "must go beyond all bounds of decency and be considered intolerable in a civilized community," *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001) (citations omitted), and cause "distress . . . so severe that no reasonable man could be expected to endure it." *McGrath*, 533 N.E.2d at 809. "[T]he bar for an IIED claim is higher" than that for a deliberate indifference claim. *See Hardy v. Hardy*, No. 10 C 5921, 2013 WL 5325077, at *5 (N.D. Ill. Sept. 20, 2013). While this is a high bar to clear, plaintiff may proceed with his intentional infliction of distress claim at this early stage of the case against defendants Lt. Lohiser, Agent Hanley, and Detective Hoffman.

However, plaintiff's state-law civil conspiracy claim, like his federal conspiracy claim, is inadequately pleaded and is dismissed.

In regard to plaintiff's state law legal malpractice claim, even if the court found it to have a loose factual connection with the other claims proceeding in this case, plaintiff has not stated a legal malpractice claim against defendant Transier. To successfully proceed with a legal malpractice claim under Illinois law, the plaintiff must establish: (1) the existence of an attorney-client relationship; (2) a duty arising from that relationship; (3) a breach of that duty by the defendant-attorney; (4) proximate cause; and (5) damages. *Fink v. Banks*, 996 N.E.2d 169, 174 (Ill. App. Ct. 2013). In addition, a criminal defendant must establish his actual innocence before being able to recover for a criminal defense attorney's alleged malpractice. *Id.*; *see Levine v. Kling*, 123 F.3d 580, 582 (7th Cir. 1997) (holding that, under Illinois law, a plaintiff must prove own innocence and a plaintiff cannot do so unless his conviction has been overturned). Plaintiff has not alleged that his conviction has been overturned; in fact it appears that the appeal of the denial of his post-conviction petition is pending. Therefore, plaintiff cannot state a legal malpractice claim against defendant Transier, and this claim is dismissed. This dismissal is without prejudice to plaintiff bringing such a claim should his conviction be overturned. *Kling*, 123 F.3d at 582-83.

The court directs the Clerk of Court to issue summonses for service of the complaint on defendants Lt. Lohiser, Agent Hanley, Detective Hoffman, Assistant Deputy Director Gomez, and Warden Hardy. The Clerk of Court is directed to mail plaintiff five blank USM-285 (U.S. Marshals service) forms. The court advises plaintiff that a completed USM-285 form is required for each named defendant. The U.S. Marshal will not attempt service on a defendant unless and until the required form is received. Plaintiff must therefore complete and return a service form for each defendant, and failure to do so may result in the dismissal of the unserved defendant, as well as dismissal of this case for lack of prosecution.

The U.S. Marshals Service is appointed to serve defendants. The court directs the U.S. Marshal to make all reasonable efforts to serve defendants. With respect to any former employee of the Illinois State Police, Illinois Department of Corrections, or Sycamore Police Department who can no longer be found at the work address provided by plaintiff, officials from those agencies must furnish the U.S. Marshal with the defendant's last-known address. The U.S. Marshal will use the information only for purposes of effectuating service or to show proof of service and any documentation of the address shall be retained only by the U.S. Marshal. Address information will not be maintained in the court file nor disclosed by the U.S. Marshal, except as necessary to serve defendants. The U.S. Marshal is authorized to send a request for waiver of service to defendants in the manner prescribed by Federal Rule of Civil Procedure 4(d) before attempting personal service.

Plaintiff is instructed to file all future papers concerning this action with the clerk of this court in care of the Prisoner Correspondent. In addition, plaintiff must send an exact copy of any document he files in this court to defendants or to defense counsel if an attorney has entered an appearance on behalf of defendants. Every document submitted by plaintiff must include a certificate of service stating to whom exact copies were sent and the date of mailing. Any letters or other documents sent directly to a judge or that otherwise fail to comply with these instructions may be disregarded by the court or returned to plaintiff.

Plaintiff's motion seeking attorney representation is denied at this time. Although "[t]here is no right to court-appointed counsel in federal civil litigation," *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014), the court has discretion to request that an attorney represent an indigent litigant on a volunteer basis under 28 U.S.C. § 1915(e)(1). In making the decision whether to recruit counsel, the court must engage in a two-step analysis: (1) has the plaintiff made a reasonable attempt to obtain counsel on his own behalf or been effectively precluded from doing so; and, if so, (2) given the factual and legal complexity of the case, does this particular plaintiff appear competent to litigate the matter himself. *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007) (en banc). This analysis does not focus solely on the plaintiff's ability to try the case, but on his ability to gather evidence and prepare and respond to motions. *Navejar v. Iyiola*, 718 F.3d 692, 696 (7th Cir. 2013).

Factors to be considered include: (1) the stage of litigation, *Romanelli v. Suliene*, 615 F.3d 847, 852 (7th Cir. 2010) (holding that it is difficult to make an accurate determination regarding a plaintiff's ability to litigate the matter when case is still in "its infancy"); (2) plaintiff's submissions and pleadings, *Olson*, 750 F.3d at 712 (well-written pleadings and appearance that plaintiff can follow instructions indicate that counsel is not needed); (3) medical and mental health issues, *Olson*, 750 F.3d at 712; (4) transfer to a different facility, *Junior v. Anderson*, 724 F.3d 812, 815 (7th Cir. 2013) (transfer to a different facility may impede plaintiff's ability to obtain evidence including affidavits/declarations from others to support his/her claim); (5) plaintiff's capabilities, including intelligence (IQ), literacy, degree of education, communication skills, and litigation experience, *Pruitt*, 503 F.3d at 655; *Dewitt v. Corizon, Inc.*, 760 F.3d 654, 658 (7th Cir. 2014) (recruitment of counsel required for a blind inmate with a tenth-grade education); *Henderson v. Ghosh*, 755 F.3d 559, 565 (7th Cir. 2014)

[13]

(enlistment of counsel was necessary for a functionally illiterate inmate); and (6) complexity of the case, *Dewitt*, 760 F.3d at 658; *Henderson*, 755 F.3d at 566; *Santiago v. Walls*, 599 F.3d 749, 761 (7th Cir. 2010); *Pruitt*, 503F.3d at 655-56.

After considering the above factors, the court concludes that solicitation of counsel for plaintiff is not currently warranted. Plaintiff states that he has made unsuccessful efforts to obtain counsel on his own. He also states that he cannot litigate this case on his own because it would put his safety at risk. However, as noted above, the attacks and confrontations plaintiff cites occurred in 2013 and 2014. The court perceives no serious risk to plaintiff's litigating this suit on his own behalf, and he appears capable of doing so, at least at this early stage of the case. Should circumstances change, and the assistance of counsel become more pressing, plaintiff may renew his motion.

Date: 10/04/2016                ENTER:

_____
United States District Court Judge

Docketing to Mail Notices. (SP)